[No. 27404. Department Two. May 19, 1939.]

FRANK GLENN et al., Appellants, v. C. E. WAGNER et al., Respondents.[1]

E. S. Avey and C. D. Cunningham, for appellants.

Hogan & Adams and Gladys W. Phillips, for respondents.

MILLARD, J.— Plaintiffs as owners of government lot 10 and that part of government lots 8 and 9 lying

[1]Reported in 90 P. (2d) 734.

east of the most westerly thirty rods of said lots, all in section 6, township 17 north, range 6 W. W. M., in Grays Harbor county, brought this action against the defendants, who own government lots 4, 5, 6, and 7 of the same section, township, and range in which plaintiffs' lots are located, under Rem. Rev. Stat., §§ 947 to 949 [P. C. §§ 7412 to 7414] inclusive, to establish the boundary lines of the above-described lots. Plaintiffs alleged that the boundary lines as originally established by the United States government were lost, and that the loss of the boundary lines was caused by the avulsion of the Satsop river.

By their answers, defendants admitted that plaintiffs own, according to their legal description only, the lands described in the complaint, and admit the ownership of the plaintiffs as to those portions still lying west of the Satsop river. As an affirmative defense and cross-complaint, defendants alleged that their lands extend from the east boundary of their lots Nos. 4, 5, 6, and 7, to the Satsop river; and that they, and their predecessors in interest, have held those lands continuously and uninterruptedly in open, notorious, hostile, and adverse possession for the required period of more than ten years next preceding the commencement of this action. As a second affirmative defense and cross-complaint, the defendants alleged that whatever land they now have in their possession and which may have been originally a part of the government lots of the plaintiff accrued to the defendants' lands by a gradual accretion; and that, as the accretions formed, defendants extended their dominion over the same.

The cause was tried to the court, who expressed the view, but made no findings of facts and conclusions of law, that the change in the Satsop river in 1885

was an avulsion; that the next change (which occurred in 1915) the court was not prepared to say was an avulsion, but, assuming that it was, that was the last change which, by any stretch of the imagination, could be regarded as an avulsion. The court said:

"The changes in 1934 and 1935 and 1936 can not be called avulsions in any sense of the word. You will recall that when I asked the plaintiffs' witnesses what happened to the soil which was washed off the west bank of the river they all said it was carried down the river and out to the bay. That is not avulsion. The evidence does not show a sudden, violent, avulsive change in this stream during the past fifteen or twenty years.

"The growth and size of trees and timber and other conditions along the east side of the river which I observed when I examined the premises, would strongly indicate to my mind that such changes in the river as took place in the last fifteen or twenty years at least were the result of erosion and not avulsion.

"On the issue of adverse possession, the testimony shows that the Wagners have been in actual, open, notorious and adverse possession of the lands east of the Satsop river for around forty-five years. They have used this land to pasture their cattle, they have cut their wood from it, they have cut the thistles on it and have planted it to seed. They have made every use of it that the nature of the land would permit. There was some testimony that the Glenns also used the land across the river to pasture their cattle, but I am satisfied that only an occasional stray went across. The evidence further shows that the Wagners have paid the taxes on this land. This is further evidence of their ownership.

"The defendants are entitled to judgment quieting their title to the lands in question east of the Satsop river."

Decree was entered adjudging defendants to be the owners of all of the lands in dispute in this action, and that the boundary of the defendants' property on the

west is the Satsop river as the same now exists, and that the defendants own all of the land in dispute lying east of the Satsop river, which, as it now exists, forms a natural boundary towards the west of the defendants' property, which is described as all of lots 4, 5, 6, and 7 in section 6, township 17 north, range 6 W. W. M., lying on the east side of the Satsop river, which river forms the westerly boundary thereof. Plaintiffs appealed.

The statute respecting the establishment of lost or uncertain boundaries of lands between two or more adjoining proprietors provides that,

"Whenever the boundaries of lands between two or more adjoining proprietors shall have been lost, or by time, accident, or any other cause shall have become obscure or uncertain, and the adjoining proprietors cannot agree to establish the same, one or more of said adjoining proprietors may bring his civil action in equity, in the superior court for the county in which such lands, or part of them, are situated, and such superior court, as a court of equity, may, upon such complaint, order such lost or uncertain boundaries to be erected and established and properly marked." (Laws of 1886, p. 104, § 1; 2 H. C., § 668; Rem. Rev. Stat. § 947 [P. C. § 7412].)

The succeeding section (Laws of 1886, p. 105, § 2; 2 H. C., § 669; Rem. Rev. Stat., § 948 [P. C. § 7413]) of the statute provides for the appointment by the court of three commissioners to establish the boundaries between the adjoining land owners.

The third section (Laws of 1886, p. 105, § 3; 2 H. C., § 670; Rem. Rev. Stat., § 949 [P. C. § 7414]) of the statute provides that the proceedings shall be conducted as other civil actions, and that the costs (which shall be apportioned equitably) of the proceedings shall be a lien upon the lands involved in the litigation.

There have been, it is clear, during the three-

quarters of a century since the government survey, many changes in the channel of the Satsop river flowing between appellants' land west of the river and respondents' land east of the river. The evidence does not preponderate against the decision of the trial court that the change in the river in 1885 was an avulsion, and that, subsequent to 1915, if it be assumed that the change in that year was an avulsion, there has been no change which may be denominated an avulsion.

There has been a widening of the river and much land washed away and carried down the river and out to the bay.

Most of the land which was washed away was from that bank of the river where the appellants' land is located, but it was not all on that side of the river. Practically all of lot 7 on respondents' side of the river was washed away, and a substantial portion of lot 6 on respondents' side of the river was also carried away by the wash of the river.

One of the witnesses, testifying on behalf of the appellants, testified that the new channel cut in 1885 was caused by log jam, and that the channel so changed followed a course around a piece of land of eighteen or twenty acres, but that the soil of this eighteen or twenty acres was not cut by the river or removed; that is, the river channel cut around this body of land. This land has been owned and occupied by respondents and their predecessors since 1893.

Appellants contend that the acreage of their land as it now exists is approximately eighty acres less than the acreage described in the government plats; and that, because of this shortage, that land must be on the respondents' side of the river. The map introduced as an exhibit discloses the river as it was surveyed by the United States government in 1862. The

Satsop river at that time was not more than two hundred and twenty-five feet wide between appellants' land on the west side of the river and respondents' land on the east side of the river. At the present time, under the evidence, the river between these two tracts of land is more than seven hundred feet wide. That is, the width of the river has increased approximately five hundred and fifty feet from bank to bank since the date of the government survey. While the entire river bed from bank to bank is not covered with water the year around, in time of freshet that bed is covered with water and comprises the river proper. Following the meanderings of the river along the frontage of the appellants' land, it is clear that the increase in the width of the bed of the river has taken more than eighty acres of land of the appellants.

Significant evidence that the predecessors in interest of appellants recognized the reduction in acreage of the land by the widening of the river is testimony to the effect that the then owner of appellants' land in 1915 requested that the acreage be reduced for taxation purposes. Upon his request, lot 9 was reduced twenty-one acres, lot 10 was reduced twenty acres, lot 8 was reduced eleven acres; or approximately a total reduction of sixty acres. This represented, in 1915, what Orton Glenn claimed to be the acreage he had lost up to that time by erosion of the stream. It should be remembered that this reduction was requested *ante litem motam*. That is to say, at a time when there was no controversy, the owner conceded, in effect, that his acreage had been reduced by the widening of the river, and that he was not then claiming that respondents or any one else had acquired the land.

Rem. Rev. Stat., §§ 947 to 949, inclusive, may

not be invoked by the appellants. Appellants and respondents are not adjoining proprietors. Their lots do not touch each other. They are not next in contact with each other. It is not material whether the Satsop river be deemed navigable or non-navigable. If the river is a navigable stream, the line of ordinary high water is the boundary line; if the stream is not navigable, the thread of the stream is the boundary.

When grants of land border on running water and the course of the stream is changed by the gradual washing away on the one side and the gradual building up on the other, the owner's boundary changes with the changing course of the stream. *Harper v. Holston,* 119 Wash. 436, 205 Pac. 1062.

If it be assumed that Rem. Rev. Stat., §§ 947 to 949, inclusive, are applicable, it must be borne in mind that the question of adverse possession (which was decided in favor of respondents) was raised by the respondents in the pleadings; hence, those sections of the statute are no longer applicable.

"Some contention is made rested upon §§ 947-949, Rem. Code, relating to the restoration of lost or uncertain boundaries, and our decision in *Snell v. Stelling,* 83 Wash. 248, 145 Pac. 466, that this case should have been decided upon the theory that it involved only the restoration of a lost or uncertain boundary, and therefore determinable alone by a survey of the exact theoretical line between the north and south half of the original Galloway five-acre tract. This contention, we think, is wholly untenable, in view of the fact that respondents' rights rest, in their last analysis, upon the adverse possession of themselves and their predecessors in interest, continuing over a period of more than twenty-five years." *Samples v. Kergan,* 109 Wash. 503, 508, 187 Pac. 383.

The judgment is affirmed.

BLAKE, C. J., BEALS, GERAGHTY, and SIMPSON, JJ., concur.